DECISION
Before this Court is an appeal from a February 22, 2006 decision by the Rhode Island Department of Human Services (DHS), denying David H. Arnold (Appellant) medical assistance benefits on the grounds of disability under G.L. 1956 § 40-8-1, et seq. Appellant, seeking a reversal of the DHS decision, filed his timely appeal on March 21, 2006. Jurisdiction is pursuant to G.L. 1956 § 42-35-15.
 I Facts and Travel
Appellant, age thirty-nine, injured his back on June 14, 2004 while performing his duties as a shipper/receiver at Building 19 in Cumberland, Rhode Island. Appellant reports that after pulling on a steel plate two or three times, he felt a pull in his lower back. He sought treatment from Dr. Karl Felber at Pawtucket Health Care, Inc., complaining of lower back pain and pain radiating down his right leg. Appellant informed Dr. Felber that he had sustained a back injury in April of the same year, yet had continued to work until his June 14, 2004 treatment visit. He has remained out of work — with the exception of a brief, failed attempt to return to a different position with his previous employer — since his initial consultation with Dr. Felber. *Page 2 
Appellant filed for Medical Assistance on July 11, 2005, approximately thirteen months after halting employment as a shipper/receiver. As part of his application, he submitted records extending from the date of his injury through June 28, 2005. The Medical Assistance Review Team (MART) and the DHS Hearing Officer examined the records provided by Appellant, including a MA-63 Physician Examination Report for Determination of Disability (MA-63), dated August 17, 2005 and completed by Dr. Steven Blazar; an AP-70 Information for Determination of Disability form (AP-70), completed by the Appellant and filed with DHS on July 22, 2005; medical records submitted by Dr. Felber and Dr. Blazar; and two MRIs and MRI reports included in the doctors' records, the first reported on July 12, 2004 and the second reported on August 20, 2005.
In responding to the AP-70 questionnaire, Appellant stated that he has an "L5 Lumbar Strain . . . pain in my right lower back and it continues down my right leg to my ankle." (AP-70, July 22, 2005, Ex. 8 at 1). He reported that he is able to get around alone and perform some household chores, but is in pain while doing them, and complains that the pain is "very bad" at night. Id. at 3. Appellant reports that his injury prevents him from working and doing activities he was formerly accustomed to doing. Id. at 4, 6. On "good days," Appellant complains of pain ranging between 4 and 5 on a scale of 1 to 10. (Tr. at 9.) On "bad days," which Appellant reports occur two to three days per week, he reports pain at a level of 8 or 9 using the same scale. Id. In addition, Appellant stated that his doctor would like to operate soon,Id. at 6; however, he cannot afford the surgery, but is willing to undergo it should Workers' Compensation cover the cost. (Tr. at 10.)
DHS's review of Appellant's medical history began with Dr. Felber's records. Said records span a period of approximately five months, beginning on June 14, 2004, the date of *Page 3 
Appellant's first consultation, and ending in November of the same year. The records indicate that as of the time of Appellant's last visit with Dr. Felber, he had been referred to Dr. Blazar and Dr. Greenblot for additional consultations.
Dr. Felber ordered Appellant to refrain from work throughout the time he was receiving treatment at Pawtucket Health Care, Inc. Dr. Felber documented Appellant's repeated complaints of back pain, and treated him with Naprosyn, Vicodin, Bextra, and a Duragesic patch, the last of which made him nauseated. In fact, Appellant commented that a "bunch" of the medications prescribed made his "stomach sick." (Tr. at 14.) In an attempt to quell his pain, he later would receive a transforaminal injection, which unfortunately caused an allergic reaction.
During his treatment period with Dr. Felber, Appellant was enrolled in some type of physical therapy program. In addition, Dr. Felber referred him to the Donley Center, where he participated in a work hardening program. It appears that Appellant continued participating in the Donley Center program while he was being treated by Dr. Blazar. The only indication that Appellant participated in either program, however, arises from the doctors' references to each — and the glimpses of Appellant's progress therein — throughout their respective records of his treatment.
In October of 2005, MART issued its decision denying Appellant Medical Assistance for the month of July 2005, and removing him from the Medical Assistance household as of October 4, 2005 because he "did not appear to meet the definition of permanent and total disability" as set forth in the DHS Manual, Section 0306.05.15. (Administrative (Admin.) Record, Ex. 3, at 2.) Upon receiving this notice, the Appellant filed a timely appeal; was granted an Administrative Hearing, which took place on December 28, 2005; and subsequently received a Hearing *Page 4 
Officer's decision, dated February 22, 2006, which similarly resulted in a denial of Medical Assistance benefits.
 II Standard of Review
This Court's review of a final agency decision is governed by the provisions of § 42-35-15(g) of the Rhode Island General Laws. That subsection provides as follows:
 "The Court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court may affirm the decision of the agency or remand the case for further proceedings, or it may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
 (1) In violation of constitutional or statutory provisions;
 (2) In excess of the statutory authority of the agency;
 (3) Made upon unlawful procedure;
 (4) Affected by other error o[f] law;
 (5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
 (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion."
While sitting in an appellate capacity with a limited scope of review, the Superior Court justice may not substitute his or her judgment for that of the agency with respect to the credibility of the witnesses or the weight of the evidence as to questions of fact. Ctr. forBehavioral Health v. Barros, 710 A.2d 680, 684 (R.I. 1998); Mine SafetyAppliances Co. v. Berry, 620 A.2d 1255, 1259 (R.I. 1993). During such a review, the Court may not substitute its judgment even though it may have been inclined to arrive at alternate conclusions and inferences based upon a review of the record and the evidence presented.Johnston Ambulatory Surgical *Page 5 Assocs., Ltd. v. Nolan, 755 A.2d 799, 805 (R.I. 2000) (quoting R.I. Pub.Telecomm. Auth. v. R.I. State Labor Relations Bd., 650 A.2d 479, 485
(R.I. 1994)); Barrington Sch. Comm. v. R.I. Labor Relations Bd.,608 A.2d 1126, 1138 (R.I. 1992). Thus, "[t]he Superior Court is confined to a determination of whether there is any legally competent evidence to support the agency's decision." Envt'l Scientific Corp. v. Durfee,621 A.2d 200, 208 (R.I. 1993). In fact, as long as "substantial evidence" supports the agency's determination, the Superior Court must uphold the agency's decision. Barros, 710 A.2d at 684 (relegating Superior Court's review of "substantial evidence" to examination of certified record).
The Rhode Island Supreme Court defined "substantial evidence" as "`such relevant evidence that a reasonable mind might accept as adequate to support a conclusion, and means an amount more than a scintilla but less than a preponderance.'" Newport Ship Yard v. R.I. Comm'n for HumanRights, 484 A.2d 893, 897 (R.I. 1984) (quoting Caswell v. George ShermanSand Gravel Co., 424 A.2d 646, 647 (R.I. 1981)). In essence, only where "factual conclusions of administrative agencies . . . are totally devoid of competent evidentiary support in the record" may the Court reverse. Baker v. Dep't of Employment Training Bd. of Review,637 A.2d 360, 363 (R.I. 1994) (quoting Milardo v. Coastal Resources Mgmt.Council, 434 A.2d 266, 272 (R.I. 1981)).
"Questions of law, however, are not binding upon the court and may be reviewed to determine what the law is and its applicability to the facts." Narragansett Wire Co. v. Norberg, 118 R.I. 596, 607, 376 A.2d 1,6 (1977). The Superior Court retains the ability "to correct deficiencies in the record and thus afford the litigants a meaningful review." Lemoine v. Dep't of Mental Health, Retardation, Hosps.,113 R.I. 285, 290, 320 A.2d 611, 614 (1974). It may also invalidate findings of fact which are "derived by ignoring evidence, misapplying the law, or *Page 6 
judging matters entrusted to experts." Slessinger v. Sec'y of Health Human Servs., 835 F.2d 937, 939 (1st Cir. 1987) (per curiam) (citingThompson v. Harris, 504 F. Supp. 653, 654 (D. Mass. 1980)).
 III The Department of Human Services
DHS is an agency within the state's Executive Branch of government. G.L. 1956 § 42-12-1, et seq. Pursuant to § 42-12-4 of the Rhode Island General Laws, DHS manages and controls federally and state funded public assistance programs, including one which provides medical assistance for qualified applicants under § 40-8-3. See § 42-12-4 (providing "[t]he department of human services shall have supervision and management of . . . [a]ll forms of public assistance under the control of the state");see also § 40-8-3 (outlining eligibility requirements for medical care benefits).
Section 40-8-1(c) of the Rhode Island General Laws provides in relevant part:
 "[It is] declared to be the policy of this state to provide medical assistance for those persons in this state who possess the characteristics of persons receiving public assistance under the provisions of § 40-5.1-9 or § 40-6-27, and who do not have the income and resources to provide it for themselves or who can do so only at great financial sacrifice. Provided, further, that medical assistance . . . must qualify for federal financial participation pursuant to the provisions of Title XIX of the federal Social Security Act, 42 U.S.C. 1396 et seq., as such provisions apply to medically needy only applicants and recipients."
DHS administers the Medical Assistance Program in Rhode Island by applying the standards of eligibility, as enumerated in § 40-8-3. Thus, qualified applicants are entitled to the payment of benefits by DHS. Eligibility is determined by DHS regulations, which must be approved by the federal government. In order to receive this federal funding, DHS must comply with this federal mandate. See § 40-8-5. *Page 7 
 IV Five-Step Test: Determining Eligibility for Disability Medical Assistance
The federal guidelines dictate that an individual will be considered "disabled" if he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3). In assessing a claimant's status, DHS must consider not only objective medical evidence, but also opinions and statements of medical sources, as well as inherently subjective evidence, such as the claimant's own assertions regarding pain, daily activities, and the extent of his or her limitations.See 20 C.F.R. §§ 416.912(b) (discussing evidence generally); 416.929(d)(1) (highlighting considerations of claimant's pain).
Section § 416.920(a)(4) sets forth a sequential five-step analysis that must be employed when making a disability determination:
 1. Is the claimant engaged in substantial gainful activity?
 2. If not, is the claimant's impairment severe?
 3. If severe, does it meet or equal an impairment listed in the Supplemental Security Income (SSI) regulations?
 4. If it does not meet or equal SSI regulations, does the impairment prevent the claimant from doing past relevant work?
 5. Considering age, education, work experience, and residual functional capacity, does the impairment(s) prevent the claimant from doing other work in the national economy?
See 20 C.F.R. § 416.920(a)(4)(i)-(v); DHS Manual §§ 0352.15.10; 0352.15.15. During this inquiry, the claimant bears the burden of proof as to steps one through four; however, if step five is reached, the burden transfers to the agency to prove that the claimant could perform work in *Page 8 
the national economy. Pope v. Shalala, 998 F.2d 473, 477 (7th Cir. 1993). "A negative answer to any question, other than step three, leads to a determination of `not disabled.'" McDaniel v. Bowen, 800 F.2d 1026,1030 (11th Cir. 1986); see also Barnhart v. Thomas, 540 U.S. 20, 24
(2003). In addition, all five steps need not be applied to each claimant; the agency may conclude its determination with a negative finding at steps one, two, or four. See Seavey v. Barnhart, 276 F.3d 1,5 (1st Cir. 2001).
The DHS Hearing Officer effectuated the aforementioned five-step analysis in her decision of February 22, 2006; she denied Appellant benefits at step five. (Admin. Hearing Decision at 9-10.) The Hearing Officer found that, while Appellant was not engaged in substantial gainful activity since June 2004, Id. at 3, and suffers from a severe impairment[1] that "logically can be expected to result in . . . functional restrictions," Id. at 6, the medical findings did not equal any listed impairment. Id. After determining that Appellant could not return to his past work as a shipper/receiver, which was "all at least medium work," Id. at 9, the Hearing Officer concluded that Appellant had the residual functional capacity to perform "work that falls between light and sedentary."[2] Id. *Page 9 
 V Analysis
Appellant contends that the DHS decision denying his benefits lacked adequate findings of fact and conclusions of law; was based on error of law; was arbitrary and capricious; and was not supported by substantial evidence. Specifically, Appellant asserts that the Hearing Officer improperly rejected the treating physician's opinion and, after doing so, inappropriately assumed the role of the medical expert. Appellant also maintains that the Hearing Officer did not adequately develop the record because she failed to recontact Appellant's treating physician. Finally, Appellant claims that the Hearing Officer neither analyzed his pain properly, nor utilized vocational expert testimony in assessing his residual functioning capacity and concluding that he was not disabled.
Alternatively, DHS contends that the Appellant has the responsibility of developing the record and proving his disability. DHS asserts that the documents Appellant submitted were incomplete, yet adequate overall. Thus, based on the information Appellant actually provided, DHS avers that its denial of Medical Assistance was correct and substantial evidence exists within the record to support its finding. Therefore, DHS requests that this Court affirm its decision.
 A Failure To Adequately Develop the Record
It is well-settled that an agency has a duty to fully and fairly develop a claimant's record. See 20 C.F.R. § 416.912(d) (stating "[b]efore we make a determination that you are not disabled, we will develop your complete medical history for at least the 12 months preceding the month in which you file your application); Brown v.Shalala, 44 F.3d 931, 935-36 (11th Cir. 1995) (requiring remand where evidentiary gaps exist within record). Nevertheless, an applicant for *Page 10 
Medical Assistance bears the burden of proving his or her disability.See 20 C.F.R. § 416.912(a) (stating, "[i]n general, you have to prove that you are . . . disabled"). Consequently, the applicant must produce evidence in support of his claim. See 20 C.F.R. § 416.912(c) (indicating applicant's responsibility to provide medical evidence to demonstrate impairments and severity thereof); see also DHS Manual Section 0352.15.20 (stating "[i]t is the responsibility of the applicant to provide medical and other information and evidence required for determination of a disability"). If, however, the evidence that the claimant produced is inadequate to determine his disability, the reviewing agency must re-contact the medical source that provided information. See 20 C.F.R. § 416.912(e) (outlining agency procedure for obtaining additional information); see also DHS Manual Section 0352.15.20 (requiring agency to assist applicant in obtaining additional information to make decision, provided applicant signs release and grants agency permission).
The Federal Regulations dictate that a duty to re-contact and clarify arises in the following situations:
 when the report from your medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques. 20 C.F.R. § 416.912(e)(1) (emphasis added).
"That situation would occur, for instance, where the treating physician's conclusion contradicts the factual findings in the same evaluation." Palmer v. Barnhart, No. 05-2372-JWL, 2006 U.S. Dist LEXIS 36931, at *13 (D. Kan. June 6, 2006). In addition, if the reviewing body indicates that a particular physician did not provide reasons supporting his conclusion that the claimant could not work, the agency's "duty to seek further development of the record before rejecting the opinion [that claimant cannot work]" is triggered. Robinson v. Barnhart,366 F.3d 1078, 1084 *Page 11 
(10th Cir. 2004) (commenting doctor's failure to provide support for conclusions about limitations, the severity thereof, and the effect of limitations or medications on ability to work, required efforts to clarify record). Similarly, where gaps remain in an applicant's administrative record, the agency should affirmatively seek additional information to clarify that which is already provided. See Brown v.Shalala, 44 F.3d at 935 (citations omitted) (requiring remand where record reveals "evidentiary gaps which result in unfairness or `clear prejudice'"); Villanueva v. Barnhart, No. 03 Civ. 9021 (JGK), 2004 U.S. Dist. LEXIS 26243, at *33, 101 Soc. Sec. Rep. Serv. 336 (S.D.N.Y. Jan. 3, 2005) (describing agency's affirmative duty to seek complete medical information in order to reconcile discrepancies in physician's treatment record). In fact, where the evidentiary deficiency involves recent treatment which may lend favorably to an applicant's assertion of disability, the agency is obliged to seek further information to avoid the prejudice that may result without considering the missing information. Brown, 44 F.3d at 935-36.
Appellant contends that DHS developed a duty to substantiate the record upon discovering that it was incomplete. The agency recognizes it has an obligation to gather medical information to complete the record, but insists that the applicant must first provide the medical records. Although Appellant's AP-70 form was returned incomplete, most notably with respect to Question #3 which required him to list any and all of his doctors or medical providers, the DHS decision clearly indicates the agency's awareness that Appellant received treatment from sources beyond those submitting medical records on his behalf. See Admin. HearingDecision at 4. Arguably, the Hearing Officer considered the absence of elaboration on the Donley Center restrictions "necessary" per20 C.F.R. 416.912(e)(1), since she indicated that the record was "deficient" in this respect and presented an "obvious barrier in assessing this case."Id. at 6 (also *Page 12 
attributing deficiency to absence of other physical therapy records to which "key references" were made as well as missing records from consultation with identified neurosurgeon). The Hearing Officer purposefully noted that "Dr. Blazar routinely defers to the work restrictions set in place at the Donley Center, and never in his own record offers specific comment on the matter." Id. Finally, the Hearing Officer acknowledges Appellant's assertion that a favorable RFC analysis by Dr. Wolfson might have been conducted. Id. at 9. This recent evaluation, however, is dismissed as something that "may well be a typographical error"; the Hearing Officer failed to inquire into its existence before formulating her decision because it had not been submitted into the instant record. Id.
Throughout the DHS decision, the Hearing Officer indicated that Dr. Blazar's records were inconsistent and lacked detail. Id. at 6. She looked with particular disfavor upon Dr. Blazar's conflicting "statement that appellant cannot work until surgery, and the notations from office visits which document (but do not elaborate on) work, with restrictions." Id. Additionally, the Hearing Officer noted an inherent inconsistency with Dr. Blazar's opinion of residual functioning capacity illuminated by his responses contained within the MA-63 questionnaire and notations of previous examinations within his own records. Upon concluding that Appellant objectively functions with little or no impairment, the Hearing Officer implicitly found that Dr. Blazar's conclusions were not supported by factual findings in his own records.Id. at 6. Thus, as a matter of law, the Hearing Officer was required to inquire into these noted inconsistencies and attempt to resolve them prior to making a determination about Appellant's qualifications for Medical Assistance.
At a minimum, Dr. Blazar's assertion that Appellant cannot work until surgery, coupled with his reference to work with prior restrictions, should have prompted the Hearing Officer to *Page 13 
seek additional information. See Robinson, 366 F.3d at 1084 (requiring remand for additional information when physician failed to provide sufficient support for his conclusions). Furthermore, without elaboration by Dr. Blazar or examination of the Donley Center records, it is unclear exactly what type of restrictions the Donley Center recommended for Appellant. See White v. Barnhart, 287 F.3d 903, 908
(10th Cir. 2002) (recognizing inadequacy of information received from treating physician triggers duty to recontact); Baker v. Bowen,886 F.2d 289, 291-92 (10th Cir. 1989) (illustrating administrative law judge's improper reliance on absence of medical evidence where it was within his power to obtain it). Although such restrictions might be more significant if formulated late in Dr. Blazar's treatment of Appellant, [3] they could indeed become equally significant — even though made shortly after his injury — based on Dr. Blazar's continued deference to and mention of such restrictions until the time of Appellant's June 2, 2005 visit. See Villanueva, 2004 U.S. Dist. LEXIS 26243, at *33. Similarly, the existence of an additional RFC evaluation that came to the attention of the agency before it rendered its decision, should have induced additional inquiry, especially since Dr. Blazar's MA-63 was entirely discounted by the Hearing Officer.See Brown, 44 F.2d at 935-36 (highlighting possible prejudice resulting from exclusion of identified, but missing evidence which might support claimant's allegation of disability). This Court has no way of knowing whether the missing evidence from this case would sustain Appellant's contentions of his inability to work if indeed this evidence exists. In the absence of proof to the contrary, however, we must assume that it would lend support to his allegations.[4] *Page 14 
In this case, the Hearing Officer failed to follow the appropriate steps to collect information that admittedly bears on the determination of Appellant's disability.[5] Furthermore, by considering the missing Donley Center records in determining "what appellant should be capable of in spite of pain and in spite of his condition," Admin. HearingDecision at 8, the Hearing Officer used these records improperly, as they indeed only may serve as a piecemeal representation of a more detailed record of Appellant's treatment and progress. Although it is possible that the Hearing Officer would have reached the same result if the missing records were at his disposal, or if Dr. Blazar clarified the record should he have been requested to do so, this Court cannot be certain. See Villanueva, 2004 U.S. Dist. LEXIS 26243, at *34 (recognizing "it is entirely possible that [a physician] `if asked' could have provided a sufficient explanation for any seeming lack of support for her findings"). The inadequacy of the record and the failure of the Hearing Officer to comply with statutory requirements compels a remand in this case, as the determination was not based on reliable, probative, and substantial evidence.
 B Weight of Physician's Opinion
Appellant further argues that the DHS Hearing officer erred in "totally rejecting" the opinion and diagnoses of his treating physician Dr. Blazar, who indicated that Appellant is indeed disabled and cannot work until he has surgery. DHS responds that it examined and relied appropriately upon all of the evidence provided, specifically on the information provided by *Page 15 
Appellant in the AP-70 and his hearing testimony, as well as the MRI reports and records collected from his medical sources.
Substantial weight is generally afforded to treating source opinions, "since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [an applicant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations. . . ."20 C.F.R. § 416.927(d)(2). A treating source relationship for disability benefit purposes may arise when "the medical evidence establishes that the claimant sees or has seen the source with a frequency consistent with accepted medical practice for the type of treatment and evaluation required for the claimant's medical condition." 3 Social Security Lawand Practice § 37:78 (2005). However, when reviewing a medical source's opinion, the mere statement that a claimant is "disabled" or "unable to work" will not necessarily result in the agency's arrival at that conclusion. See 20 C.F.R. 416.927(e)(1).
The treating source's opinion will be given controlling weight so long as the "opinion on the issue(s) of the nature and severity of [an applicant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." Id. If, however, a treating source is not given controlling weight, it should not be automatically rejected. See 20 C.F.R. § 416.927(d)(2)-(6);see also Johnson v. R.I. Dep't of Human Servs., No. PC/05-6663, 2006 R.I. Super LEXIS 183, at *29-30 (Super.Ct. Dec. 15, 2006) (highlighting importance of addressing 20 C.F.R. § 416.927(d)(2)-(6) factors prior to rejecting treating source opinions). Social Security Regulation *Page 16 
96-2p provides that an agency must still weigh all the factors[6] in20 C.F.R. § 416.927 and § 404.1527 while assessing a noncontrolling treating physician opinion and provides:
 "[a]dicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must still be weighted using all of the factors provided in 20 C.F.R. § 416.927 and § 404.1527. In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.
 Also, in some instances, additional development required by a case for example, to obtain more evidence or to clarify reported clinical signs or laboratory findings may provide the requisite support for a treating source's medical opinion that at first appeared to be lacking or may reconcile what at first appeared to be an inconsistency between a treating source's medical opinion and other substantial evidence in the case record."
In discrediting Dr. Blazar's opinion, the Hearing Officer acknowledged problems with two specific items submitted on Appellant's behalf: the overall treatment records maintained by Dr. Blazar, and the MA-63. The Hearing Officer found Dr. Blazar's repeated deference to the Donley Center's work restrictions troublesome. (Admin. HearingDecision at 6.) She also found the record devoid of any elaboration on Appellant's ability to work with restrictions. Id. Additionally, the noted inconsistency of Appellant's seeming ability to work with restrictions based on Dr. Blazar's notations, and the doctor's conclusory statements that Appellant is out of work, prompted her reluctance to afford considerable weight to Dr Blazar's opinion of residual *Page 17 
function as set forth in the MA-63.[7] Thus, based on these observations, the Hearing Officer asserted that the "record lacks a true treating source opinion of residual functional capacity." Id. The Hearing Officer's analysis also affected her examination of the MA-63 provided by Dr. Blazar. She commented that Dr. Blazar completed the form "some two months after he last saw appellant," and merely provided a "restatement of the appellant's situation." Thereafter, she concluded that it "does not stand as a valid treating source opinion of function, most specifically since the doctor fails to provide a statement attesting to specific functional abilities, based on objective medical evidence and testing." Id. The Hearing Officer failed to address the factors set forth in the regulations prior to rejecting Dr. Blazar's opinion. See Rogers v. Comm'n of Soc. Sec. Admin., 486 F.3d 234, 242-43
(6th Cir. 2007) (recognizing failure to identify reasons for discounting opinions and explaining precisely how reasons affect weight accorded opinions "denotes lack of substantial evidence" supporting disability determination); Robinson, 366 F.3d at 1083 (requiring articulation of "legitimate reason" in discounting medical opinion).
In the instant case, Dr. Blazar is Appellant's most recent treating physician; he treated Appellant six times from October 14, 2004 through June 28, 2005, a period of approximately eight and one half months. (Admin. Record, Ex. 9.) This is the longest consecutive period of treatment received by Appellant from a medical source. Id.;see also Admin. Record, Ex. 11 (illustrating Dr. Felber's records span approximately five months through twelve visits during 2004). The Hearing Officer neither acknowledged that Dr. Blazar is a specialist in his field of orthopedics, nor appeared to give this fact any credence while considering his review of Appellant's MRI results — since he is uniquely qualified to review such documents — and his treatment of Appellant thereafter. See 20 C.F.R. § 416.927(d) (demanding "good reasons" when *Page 18 
assigning weight to treating source opinions); Johnson, 2006 LEXIS 183, at *32-33 (indicating "lack of detail" insufficient to entirely discard treating physician opinion). Additionally, Appellant's pain was addressed, recorded, treated, and monitored by Dr. Blazar with medication and a walking program after he reviewed Appellant's first MRI report and conducted numerous physical examinations. (Admin. Record, Ex. 9, at 4/5/2005.) Thus, the nature of Dr. Blazar's involvement in Appellant's treatment was extensive. Although the Hearing Officer noted inconsistencies within Dr. Blazar's own records, this deficiency warranted the Hearing Officer's recontacting Dr. Blazar to clarify his record. See Robinson, 366 F.3d at 1084 (requiring remand to contact physician where administrative law judge concluded sufficient support for his conclusions were lacking).
The Hearing Officer rejected the MA-63 form and other records provided by Dr. Blazar without addressing the factors as required by statute and without requesting clarification to address any "inconsistencies" contained therein. Accordingly, the agency decision is clearly in excess of its statutory authority and not supported by the substantial evidence of record.
 C Residual Functioning Capacity
This Court reaches the remaining issues raised by Appellant instructively, since our remand to clarify the record and consider Dr. Blazar's opinion may affect the Hearing Officer's ultimate resolution of other issues bearing on Appellant's disability. Appellant contends that the Hearing Officer incorrectly applied the "grids" in assessing his disability via his residual functional capacity (RFC) at step five, in part, because the Hearing Officer improperly assessed *Page 19 
Appellant's pain. DHS asserts that its Hearing Officer properly reviewed the evidence in arriving at its decision, but makes no argument in its brief as to the applicability of the grids.[8]
At step five of a claimant's disability analysis, the Hearing Officer is responsible for determining what a claimant may do in spite of his or her limitations. 20 C.F.R. § 416.945(a)(1). Although the issue of a claimant's RFC is an administrative finding — not a medical issue regarding the nature and severity of an individual's impairment — the adjudicator is neither qualified, nor permitted to, interpret raw medical data in function terms absent a medical opinion supporting the determination. Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (citingMansoPizarro v. Sec'y of Health Human Servs., 76 F.3d 15 (1st Cir. 1996)). As such, medical opinions are "never entitled controlling weight or special significance," but nonetheless must be carefully considered in fashioning a claimant's RFC. See Social Security Regulation 96-5p;see also Reeves v. Barnhart, 263 F. Supp. 2d 154, 162 (D. Mass. 2003) (citing Arroyo v. Sec'y of Health Human Servs., 932 F.2d 82, 89 (1st Cir. 1991)) (reassuring physician's ultimate conclusion on claimant's disability not binding on adjudicator). However, the RFC assessment must include the following:
 "a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts . . . and nonmedical evidence. . . . In assessing RFC the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis . . . and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." Soc. Sec. R. 96-8p, 1996 LEXIS 5. *Page 20 
To aid in this assessment, DHS representatives may use a set of medical-vocational guidelines, more commonly known as "the Grid," to simplify the application of step five in the disability analysis.See 20 C.F.R. Part 404, Subpt. P, Appendix 2.
The grid is largely representative of the potential occupational base available to a Medical Assistance applicant in light of his ascertained limitations. Ortiz v. Sec'y of Health Human Servs., 890 F.2d 520, 524
(1st Cir. 1989). "Whether, by so invoking the grid as a `framework,' the [agency] can satisfy [its] burden under step five without resorting to vocational evidence depends on how closely the claimant's characteristics and the Grid criteria overlap." Id.; see also Allen v.Barnhart, 357 F.3d 1140, 1143 (11th Cir. 2004) (stating "a large body of circuit precedent preclud[es] use of the grids unless the claimant's RFC precisely matches the RFC specified for the grid relied upon"). If a claimant possesses a non-strength impairment, even if identified as significant, which reduces the occupation base only marginally, the grid will remain highly relevant and can be relied on exclusively.Id. In the event that the adjudicator does not entertain vocational testimony, his assertion that the grids were used as a "framework" translates into nothing more than his exclusive and realistic reliance on the grid to show the existence of jobs a claimant could perform.Id. at n. 4. Accordingly, the more the occupational base is eroded by a nonexertional limitation, such as pain, "the less applicable are the factual predicates underlying the Grid rules, and the greater is the need for vocational evidence." Id. at 525; see also Nettles v.Schweiker, 714 F.2d 833, 838 (8th Cir. 1983) (demanding assessment of pain beyond mere grid application to determine RFC).
It is well-established that conclusive reliance on the grids is improper where an applicant for Medical Assistance suffers from nonexertional impairments. Allen, 357 F.3d at 1143 (discussing grid inapplicability where nonexertional impairments afflict claimant). Thus, DHS *Page 21 
may not rely on the grids unless the claimant has no significant nonexertional impairment. In the instant case, the Hearing Officer recognized Appellant's pain as a severe impairment at step two. Appellant testified, and the Hearing Officer recognized, that Appellant experiences "pain with both prolonged sitting and standing." In fact, she indicated that pain was the "primary issue" in assessing his disability. (Admin. Hearing Decision at 6.) The frequent indications of Appellant's pain throughout the medical record, including Dr. Blazar's recommendation that Appellant visit a center specializing in pain management, support this conclusion. Nonetheless, the Hearing Officer dismissed Appellant's daily encounters with pain as follows:
 [H]e performs his ADL's, albeit with pain, but is able to do so.[9] His pain is not severe by his own characterization on an every day basis. This is further supported by Dr. Blazar's numerous references to the Donley Center and work hardening activities. The objective examinations also found in Blazar's records seem consistent with this impression. Essentially, in order to be so severely limited in all activities, to be completely unable to sit or stand, the findings on examination would be much more acute and more striking than what is found in the appellant's case.[10] Since in this case they are not, he seems to remain capable of at least a reduced range of light work/modified sedentary. Id. at 8-9.
In analyzing Appellant's RFC, the Hearing Officer also commented that, "clearly pain is the factor that impedes the appellant's exertional abilities since there are no identified actual *Page 22 
functional deficits such as weakness or gait difficulties."Id. at 9. Although true, she overlooked the fact that pain also arises after completing significant nonexertional limitations, such as prolonged sitting and standing, as established by Appellant's testimony. (Tr. at 9, 13.)
This cursory evaluation of pain, especially in light of the Hearing Officer's characterization of Appellant's pain as a primary issue in his disability case, is inadequate. Appellant's need to shift positions every "20 minutes, half an hour, maybe longer" appears to be a nonexertional limitation not contemplated by the grids, thereby requiring the agency to obtain testimony from a vocational expert.Tackett v. Apfel, 180 F.3d 1094, 1999 U.S. App. LEXIS 13975 (9th Cir. 1999) (assessing shifting positions every thirty minutes as not within grid purview); Thompson v. Sullivan, 987 F.2d 1482, 1490 (10th Cir. 1993) (requiring vocational testimony if claimant determined unable to sit for extended periods, thereby especially affecting range of unskilled sedentary jobs).
Thus, the Hearing Officer's acknowledgement of Appellant's pain, coupled with her step two finding, makes her conclusion at step five — that "because there has been no evidence documenting any other impairment as a result of pain, such as loss of concentration," Appellant does not have "a medical condition that is severe enough to result in a disability" — arbitrary. In sum, the Hearing Officer's use of the grids alone to find Appellant not disabled may only be upheld as a matter of law if she correctly assessed that Appellant's pain did not constitute a nonexertional impairment that affected his ability to do light and/or sedentary work. See Nettles, 714 F.2d at 836 (demonstrating inapplicability of grid where claimant's pain considered nonexertional impairment). The Hearing Officer's failure to develop a complete record and the failure to weigh the appropriate factors before dismissing the opinion of Appellant's treating physician undermined her assessment of claimant's possible nonexertional limitations. As such, *Page 23 
the Administrative Hearing Decision is not supported by reliable, probative, and substantial evidence of record and necessitates a remand.
Accordingly, this case shall be remanded to the agency to consider information gleaned from a complete record, as discussed above, and to entertain the possibility of testimony from a vocational expert regarding Appellant's employability in spite of his nonexertional impairments. No particular result is herein dictated; this record fails to substantially support a finding of disabled any more than it supports a finding of not disabled.
 VI Conclusion
After a review of the entire record, this case is remanded to the agency, with instructions to (1) substantiate the record and correctly evaluate the opinion of Dr. Blazar, and (2) conduct such further proceedings as are necessary to assess the level of Appellant's pain, and determine what jobs he can perform with that level of pain, given any limitations imposed by his RFC. This Court retains jurisdiction. Counsel shall submit the appropriate order for entry.
[1] It is well established that a threshold inquiry at this step is the 12-month durational requirement. See 20 C.F.R. § 416.909. The Hearing Officer did not specifically address this requirement; however, it may be implied that she found the durational requirement satisfied since she proceeded to analyze all five steps falling under the disability inquiry. See Administrative (Admin.) Hearing Decision
at 3-4.
[2] Light work is defined at 20 C.F.R. § 416.967(b) as follows:
 Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.
Sedentary work is defined at 20 C.F.R. § 416.967(a):
 Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.
[3] The Court acknowledges Appellant's concern that the Donley Center restrictions might be neither controlling, nor entirely useful based on the status of the medical professional formulating the restriction or time frame during which those restrictions were made. (Plaintiff'sBrief at 8.) The Court acknowledges that the Hearing Officer shall lend appropriate weight to such information as received upon remand.
[4] This Court does not suggest that a remand is necessary each time a claimant alleges that the agency inadequately completed the record. Where as here, however, the missing evidence pertains to recent medical treatment or a recent evaluation that a claimant contends is helpful to proving his disability, the likelihood of unfair prejudice is abundant. In this case, Appellant's attorney alluded to an RFC evaluation conducted by an identified doctor, Dr. Wolfson. Because the Hearing Officer recognized no other "true treating source of residual functional capacity," the existence of another medical professional's opinion might have been pivotal to Appellant's case if favorable to his claim of disability.
[5] The Court does not reach the issue of whether a consultative examination would be appropriate under the circumstances, for a more thorough record might eliminate the need for such measures. We are reluctant to order an examination of Appellant at the government's expense if the expanded record is sufficient for the Hearing Officer to arrive at a disability determination. See 20 C.F.R. § 404.1517.
[6] The agency will utilize the following factors in assessing the actual weight assigned to source's opinion: length of the treatment relationship and frequency of examination; nature and extent of the treatment relationship; amount of support that grounds the source's opinion, including relevant evidence and explanations; consistency of the source's opinion with the totality of the record; specialization of the source; and other factors which tend to contradict the opinion as brought to the court's attention by the agency. See20 C.F.R. § 416.927(d)(2)-(6).
[7] Please note that Page 5 of the Administrative Hearing Decision is entirely devoted to recounting portions of Dr. Blazar's records, which were compiled prior to Dr. Blazar's completion of the MA-63.
[8] The Hearing Officer appears to have applied the grids at step 5 of the disability analysis (Admin. Hearing Decision at 9); however, in completing steps 2 and 3, the Hearing Officer elaborated on what appellant "should be capable of" in terms of function. Practically speaking, then, a portion of the Hearing Officer's RFC formulation is found in steps 2 and 3. (Admin. Hearing Decision at 4-9.)
[9] "[T]he ALJ may not rely on minimal daily activities as substantial evidence that a claimant does not suffer disabling pain." Thompson v.Sullivan, 987 F.2d 1482, 1490 (10th Cir. 1993). Additionally, "the `sporadic performance [of household tasks or work] does not establish that a person is capable of engaging in substantial gainful activity.'"Id. (citations omitted). Pain analysis also turns on other relevant factors, such as a claimant's daily activities; the pain's location, intensity, duration and frequency; aggravating factors; type of medication used to treat the pain and related side effects thereof; treatment other than medication; and other measures used to relieve pain). See 20 C.F.R. § 416.929(c)(3).
[10] "Although it is clear that the [adjudicator] may disbelieve the appellant's subjective complaints of pain `because of inherent inconsistencies or other circumstances,' he may not circumvent [considering a claimant's subjective evidence of pain] `under the guise of credibility findings.'" Nettles v. Schweiker, 714 F.2d 833, 837 (8th Cir. 1983). The record pertaining to the Hearing Officer's RFC analysis does not specifically turn on assessing Appellant's credibility; however, the short and conclusive analysis of Appellant's pain raises the Court's curiosity. Specifically, the Hearing Officer noted that Appellant reported that he was unemployed, yet told Dr. Blazar that he had submitted job applications and was awaiting offers. (Admin. HearingDecision at 4.) Nowhere does the Hearing Officer directly assess credibility, but this particular finding appears to assess Appellant's complaints of pain with no elaboration on exactly how long Appellant claims to be able to sit or stand before requiring a change in position.